The first case for argument this morning is 18-2189 in Re ThermoLife International. Mr. Gallarosa, good morning. Thank you, Mayor. Police and Court, Robert Gallarosa from Latham & Watkins for ThermoLife International. Claim 6 was already allowed by the PTO and there's no sound basis in law or fact for the PTO to withdraw that allowance and there was no sound basis for the Board to affirm that rejection. The Board's opinion is affected by legal error and confirmation bias in several ways, but the main way is that it used ThermoLife's inventive disclosure against it. The Board used it when interpreting the prior art disclosure, for example, on Apex 22, where they said that we find the amount of guidance provided in the prior art is substantial, particularly as the process described appears substantially identical to the method taught in the 074 patent. They did so again on Apex 18, when dismissing the shortcomings of the prior art and expert testimony. And they said the same second method... Can I just... As I understand it, there are two issues. What did the prior art disclose and was the prior art enabling? Which of those two issues do the references by the Board to this patent bear on? On both of them, Your Honor. So when they were interpreting the prior art disclosures, they said the guidance in the prior art is substantial. And particularly, for example, when they were saying for enablement, the amount of experimentation necessary to the mixing method was cited as being substantially identical. So what the Board... Right, but just on enablement, I mean, I had taken it that it is fairly common and legitimate when a patent owner responds to an anticipation rejection by saying that reference is not enabling for the Board to say, look, the teaching of how to make in the prior art reference is really about the same level of detail as what you find in the patent owner's patent. And that actually counts in favor of the rejection. So that's not an illegitimate reference. Not the level of detail, Your Honor. What they did is they looked to it to confirm what the prior art was saying. And that's error under this Court's case on Rasmussen and Morsa to actually fill in the gaps in the prior art. Because what we know here is that the specimen... Sorry, just to back up one second, is that the Board didn't just ask about whether it was the same. The Board erected a higher legal test for presumption of enablement because of the supposed substantially identical nature of the thermal life process, specifically in Apex 30. They didn't just say that it's identical. What they said is it has not been shown to be... The thermal life process has not been shown to be, quote, substantially different. And because of that, they have not conclusively shown that the Sains mixing process does not produce creatine nitrate. Do you agree that the burden of proof would rest with you and your client? But your argument is that the standard that was applied, the burden of proof, the amount of burden was incorrect. Do you agree, though, that you had the burden of proof on enablement at least after the PTO submitted or presented a prima facie case? If they did present a prima facie case, then yes. But they didn't. Because the Sains and Gomelan disclosed a different compound on their face. It can't be the test that you have a burden to disprove making a different compound. That flips an inquiry on its head. But assuming that there was a prima facie case, you would agree that your client had the burden of proof to show enablement. And then your challenge is more to the language that the Board used or the amount of proof that they required, where they referred to, like, conclusively and other language like that. Yes. If there was a prima facie case, we would agree with that. And the Board went farther than that, though. The Board specifically said they were looking for clear error. And I believe on Apex 30, it's... Just to be clear, the clear error statement is in the portion of the Board's opinion discussing what the art teaches, not the enablement portion, right? Correct. That's Apex 16 to 17. I thought we were just talking about the enablement. They go hand in hand, though. Because you can't enable something if it doesn't disclose the compound. That's just basic common sense. And so what the Board said is that without sufficient evidence to support a finding of clear error, this is Apex 16 to 17, we're unwilling to find the express teaching of creatine nitrate to be ambiguous. And they went a step further. They also did it for enablement on Apex 30. What they said was it's not just substantially identical. They said Thermolife failed to show that it was, quote, substantially different. And indeed it is. The Thermolife process is irrefutably different than the mixing process in the same. It has an extra... Because of the order in which water is added? Not just the order, Your Honor. It has a separate step. And that separate step is not the same as the same step. I'm sorry. What is the separate step? The separate step of water. It has a separate step of adding water to the mixture of creatine or amino acid and the acid. Can you provide a finer point on that? Exactly what is the difference? It has a separate step of adding water. When is that? How does it compare? Sure. They sound very similar. On Apex 38, column 9, 19 to 21, it's a cost-effective method to synthesize creatine nitrate by combining nitric acid and creatine. That's the first step. Then mixing with water. Sorry, the then is not there, but then mixing with water and leaving to crystallize. There's two differences between that and the prior art. First is the individual step of mixing with water. That is not simply dilution, as the board said. As one of ordinary skill in the art would know that if creatine dehydrates, it turns to creatinine, which is important. And the second difference is to crystallize. It's not evaporate, it's crystallize. And again, why that matters, as one of ordinary skill in the art would know, is if you evaporate, you're going to get creatinine, which is useless. You need creatine. And the crystallization and the evaporation, that's at 3695 of the record, and it's also in Gamellan at 4158 of the record. So it's well-known. So the process is different, and the PTO relied on this assumption that it was the same to ignore the errors in the prior art. And it also did that for enablement, too. And there's really four facts, if you look at them, that the board overlooked. Number one is that Gamellan teaches no matter what strength of acid you mix creatine with, it's not going to produce creatine nitrate. It says on 3158 that if you mix creatine with a strong acid, it's going to create creatinine. If you mix it with a dilute acid, nothing happens. So that shows specifically that the mixing method doesn't work. It wasn't expected to work. And then in Desane's, there's three more, I promise you, four. Three are for Desane's itself. On 3627 of the record, Dr. Chamberlain expressly showed that the bubbling method, the first method in Desane's, cannot work as a matter of accepted science. That's the equations that he showed. Any product of that is not creatine nitrate, and that's irrefutable, and the board has never addressed it other than the PTO and RPA. And the relevance of that to the mixing method? So it's to Desane itself. It shows that it's not. And the relevance is by 0.3, which is Desane's also says that what's produced by the bubbling method and what's produced by the mixing method is, quote, the same compound. So if it's the same compound and you already know that it's not creatine nitrate, you know it's not going to be creatine nitrate for the mixing method. But that alone is not enough. For the mixing method itself, I'm sorry, I believe I gave you the wrong site. The equations is 4212 for Dr. Chamberlain. But on 3627, Dr. Chamberlain looked at the mixing method, and he said as an irrefutable matter of just simple math and chemistry, the mixing method did not create creatine nitrate. If you assume in favor of Desane's that he was using the exact amounts of creatine, 1.057 grams, and that it was equal molar amounts, and somehow he did that back then, you would result, the result would be 1.556 grams of creatine nitrate. Now, talking about creatine nitrate, you said that the formula in Desane's is different. I agree that the formula in Gamwin seems different, but Desane's is just two moles, and the board explained that it was, I think they used the word converted, to the same formula of one mole of creatine nitrate. They had the right formula just doubled for creatine, and the doubled formula for creatine nitrate, two moles versus one mole. Why should I not credit that fact finding by the board that it converts, it's the same formula, one is just one mole versus two moles? For three reasons. First, that's just hindsight based on what we now know about creatine. Second, it's not science. You can't simply divide by two. And three, Desane's didn't just- How do I know it's not science? My third point is that Desane's specifically says that it determined the formulas based on the weights, the percentage of 32.8% that Dr. Chamberlain was talking about. And he specifically explained how those weights don't add up. That's at 42.13 of the record. He said, even if you assume that, even if you take that at face value, it still makes no sense. It can't be just dividing by two, because he got the formula by percentages. So is it your position that there's your expert's testimony on this point versus the board's assumption? Is there any evidence at all to support the board's fact finding? No. There's nothing but to say so that it's the skill of one of ordinary skill in the art just to mix it. That's the same argument that they made- Well, I meant about the formula. You said just to mix it, but I meant about that the formula, that the formula for creatine nitrate in Desane's converts to one mole of the formula in the patented- I apologize, Your Honor. There is no evidence for that either. The only evidence in the record is Dr. Chamberlain saying that that's not the right conversion because of the percentages and how that formula was calculated. You can't just divide by two. It's not that simple. How is a procedural matter in an ex-party proceeding in the board, does evidence get developed contrary to the applicant, or in this case, patent owner's evidence? I believe the examiner would search for it, Your Honor, and they would bring up the prior art references that they would have. But here- But the examiner, anyway, at least as an ordinary matter, doesn't get to hire an expert. Not that I'm aware of, no. But here, that's exactly what the examiner did, which is what is so remarkable. The examiner and the board and the PTO didn't just have to say so. They had all these modern references before it to support the idea that it's simple mixing. They had all of them. Indeed, when Claim 6 was denied, or sorry, when they rejected, when the allowance was denied, they added Terzian to make that exact point, that according to modern science, you can just mix it. That's exactly what they said. And yet, ThermoLife has traversed every single one of those modern references, including by the co-author of Terzian, Dr. Petrozan, who said that's unreasonable to just believe that. There's no expectation of success in that, and you can't just get that from mixing. And all of that evidence is unrebutted. But you still have the four points. Gemellan teaches away. It's irrefutable. The bubbling method at Desane's we know does not work, and we also know that the mixing method could not have created creatine nitrate. All of those points are unrebutted in the record. All of that is substantial evidence that it's not enabling. And the board simply looked at ThermoLife's method and said, because it's substantially identical and you haven't shown it to be substantially different, which was a wrong assumption, then it's not, it doesn't overcome the presumption of enablement, which they also had the higher level of clear error, conclusive, and necessary. You're into your rebuttal, why don't we hear from the other side? May it please the court. Because this court needs to only affirm one ground of rejection, because Claim 6 is rejected on three separate grounds, I'm going to focus on Bargard. And Bargard unambiguously discloses creatine nitrate, its correct chemical formula, and compares its solubility to other salts. Desane and Gemellan both disclose a mixing method to make creatine nitrate. It's a very simple one-step method. Crystalline creatine is dissolved in nitric acid, and the solution is evaporated. ThermoLife chose not to make the mixing method. They chose not to have, they had four experts. None of them tried to replicate the mixing method. Instead, they spent a lot of time talking about the bubbling method, but the board didn't rely on the bubbling method, and it's not really relevant here. Do you think that they had to replicate the mixing method in order to be able to prevail in this case? I think yes, or they had to have some better evidence. What they have is just conjecture that the mixing method wouldn't work. There's an express disclosure that Desane's made creatine nitrate using the mixing method, so they had to do something to resolve that. When you say Desane's made creatine nitrate, is it because of the words creatine nitrate, or is it because of the formula, which was double the formula in the claimed invention? Both. I mean, Desane's had the double formula, but I want to... Okay, but first, I want to point you to 3927, which is a declaration by Dr. Chamberlain, who is their expert, and he says in paragraph... Let me catch up with you, okay? Thank you. It's paragraph 23. So nitric acid is NHO3, but in the third sentence, when he's talking about Desane, he says, one would assume that N2H2O6 would be two equivalents of nitric acid. So he's doing the same thing that the board did, and this is their expert. What about the point about the numbers in grams, the weight number is not really jibing? So I think that is really almost irrelevant here, because the question is whether a person of ordinary skill in the art in 2007 could follow the instructions in Desane and make creatine nitrate. Whether or not Desane's numbers actually matched up using chemistry from 150 years ago, I think doesn't really matter. What you want to know is if somebody in 2007 could read that one sentence, dissolve 1.057 grams of crystallized creatine in nitric acid containing 0.447 grams of N2H2O6 and evaporate at 86 degrees Fahrenheit. The question is whether somebody could do that and make creatine nitrate. And that's... Is it making... This is going to be a slightly confused question, but one of the things that's been a little bit hard to keep straight here is the way in which, at least on ThermoLife's side, the question of what was disclosed seems to bleed into how to make. And I guess increasingly have the feeling that there may not be such an independent how to make point being made on the other side as much as we really... We have substantial evidence to conclude that what is taught in terms of the compound, not how to make it in the three prior art references, is actually the same thing. Correct. And I think they mix the tests. Often in their brief, they say ambiguously enables. So they're kind of mixing whether or not a reference is ambiguous to whether or not... Because I took it... I think Mr. Garris's point, and he can correct me if I'm wrong about this, one of the points he made this morning is that if you look at the weights, the gram measurements, that that's a very good reason, particularly with his expert having so testified, to think that what was actually being disclosed there is not the same thing at all. But again, that's not... I don't think that's the right test. I think the test is whether or not a person could read the instructions on how to make it and make it. That's what we're trying to figure out. But the thing that really puzzles me about that statement you've got is that you're saying how to make it. What if it isn't the same thing as what it's claimed? Then why are those instructions on how to make it even relevant? Because it's an express disclosure. It expressly says, this is how you make creatine nitrate. And in order to rebut an express disclosure, you can't just have conjecture and say, well, when I figured out the gram... But it's not just conjecture. The point is that what it's making might not be the same thing as what's in the claim. Right, but they never tried to make it to see if a person of skill could make it using this. Right? That's the test. The test isn't whether or not DeSange made it, it's whether DeSange has... What would they be trying to make? Would they be trying to make the formula that's disclosed in DeSange, or would they be trying to make what's in the claim? So they would be trying to make creatine nitrate, which is what's in the claim, which is what Barger unambiguously discloses, both its name and its formula. And so that's the question, whether in 2007 someone could read these instructions and make it. It's not to go through DeSange and try and say, well, I see a discrepancy here because in the 1850s, you know, whatever. He also says that Gamellan teaches a way, but Gamellan also specifically teaches how to make creatine nitrate. Although in one place it does say if you use strong acid you get creatinine, and if you use weak acid it's unaltered. He also has specific instructions how to make creatine nitrate using nitric acid. Just to be clear, on the Barger, your point, Barger, is it, or Barger? I don't know. I didn't say Barger. We can't ask. Barger, you say, expressly identifies the correct creatine nitrate. And this is by a combination of two things. One is the page 60 structure of creatine, which the examiner cited, I think, six times as the structure for creatine. And I think in their August 20, the Thermolife's August 2012 amendment expressly conceded was in fact the structure of creatine disclosed on page 60. And then you combine that with page 160 with the DOT NOH3. A couple things for, so for creatine nitrate, it's that it names it, it gives its correct formula. That's on the page 160, the C blah, blah, blah, and there's a DOT. And they made a point, I forget whether they make it here or just below, about the DOT is used in Barger to refer to covalent bonds, not ionic bonds. And the examiner said, I don't think so, because a salt is always an ionic bond. Exactly. They don't make that in the reply, but they made that in their initial brief. Right. So Barger, we have those three things comparing its solubility, its formula, its name, and then also the structure of creatine is correct in Barger itself. The board copied the wrong structure. And so what you think is that the only thing that's left is how to make it. It's how to make it. And we think to saints, this one sentence tells you how to make it. And that it may not be dispositive, but that it counts that they didn't try. I think it is dispositive, because I think what they put forward is only conjecture and supposition as to what was going on. Did they have one of their experts who said, I'm just not remembering the record well enough. Did they have somebody who said, well, I didn't, but I had a colleague who tried to do something quite like it, but you say it wasn't quite the same thing. Right. That was for the gas. Can you elaborate on that a little bit? So DeSage has two different ways of making it. It has the gas bubbling and the mixing method. The board only relied on the mixing method. They never tried to make the mixing method. At all? At all. Oh, okay. So instead, he asked one of his colleagues to do the gas bubbling method. There's really no details. He just said... Okay, I was somehow misremembering that the colleague did a version of the mixing method. Right. That's not right? That's not right. The colleague only tried the bubbling method, and that's what most of their declaration is about. What they say about the mixing method is very, very minor. The other thing is the office did not use their disclosure to fill in gaps in the art. We basically... The board used their disclosure simply to explain, because one of their arguments is there's not a lot of detail for the mixing method. They don't have the... Well, actually, DeSage does have a concentration, but they say it doesn't talk about the ionic forms of creatine, how long you mix. And so what the board did was it looked to their patent specification to show that in 2007, those details weren't needed. Because actually, when you compare their patent specification to DeSage and Gamellan, they have less disclosure about how to make creatine nitrate. Can I ask you a question about some of the language that the board used in the two different places on what the prior references taught, and then later on enabling words like clear error and conclusively and necessarily. Do you simply have to say that's all harmless error because the conclusions are sufficiently clear that it's perfectly clear the board would have drawn the same conclusion had it not used that language? Or how do you deal with that language, which doesn't seem quite right? So on APPX 29, the board says twice that it's using preponderance of the evidence. Right, but it also says conclusively and necessarily, so you wonder a little bit about what those words are doing there if they weren't actually part of the board's... Right. And so it is our position that because they're only putting forward speculation and conjecture, they would lose under any standard. So the fact that in one sentence they may have used the word conclusively, and maybe that wasn't an apt word to use, they didn't make their showing under the preponderance. What about the earlier references in the what the references taught part of the board's discussion? That's where I think the phrase clear error comes up at one point. Correct. It's just kind of a standard of review rather than persuasion language. And I think that was simply saying that the reference taught something expressly, and they did not rebut that. That said APPX 16 to 17. So the prior art, so what the patent owner was trying to say was the prior art on its face is factually incorrect. And what the board said in response to that is without sufficient evidence to support a finding of clear error. And I don't know that clear error is the right standard, but they have to show something to rebut an express factual statement in a reference. And that's got to be some kind of standard. Maybe clear error isn't the correct one, but. Can I ask you about Barger and the board's opinion about Barger for a minute? Sure. So in the board's opinion, they identified the incorrect structure for Barger. Correct. And in your brief, you refer to the correct disclosures, which was cited by the examiner, I guess, in the examiner's answer before it went to the board. Maybe, was it in the examiner's answer, I think, before the board's first opinion, I believe is what you were citing. It's in the examiner's, there's at least five times the examiner cited that. In the final rejection before the first one. In the final rejection. Not the answer. Not the answer. Oh, thank you. And also. Anyway, so my question is this, is that in the reply brief, one of the points that ThermoLife makes is that it would be improper for the PTAB to, you know, have relied on the examiner. The PTAB didn't in any way say it was incorporating anything in the examiner's rejection or anything in its answer. And so it would be improper for the PTO to now rely on what the examiner said when the board didn't adopt any of that. Well, first of all, the board also cites to those pages, which, and that's at APPX9 and APPX10. It also cites to Barger69, which is that page, not for this specific point, but they did cite to it. Also, the board is, unless they completely disavow something that the examiner said, it's assumed that that's part of what the board's reasoning is. Can I ask you this? In the board's first decision, the 2016 decision, the board does, I think, at 4132, expressly adopt all the factual findings of the examiner in the final rejection and the answer, which would seem to, which I think would include all of the six references to page 69 on this specific point. What happened when, what happened to the board's first decision after it went, they introduced a new ground of rejection and went back down and came back up? Did those, did the board's findings in the first decision remain part of what the board is deciding, or did they go poof somehow? That's not a technical term. I mean, if they remain part of it, then it seems to me the board did actually adopt the examiner's specific findings about page 69 of Barger as the creatine, which, as I say, I think also the August 22, 2012 amendment by Thermalife expressly concedes, teaches the correct structure of creatine. Correct. And I mean, the board, as far as I know, never vacated that decision, so I assume that that is still part of it. Is there some ordinary course that we know what happens? I mean, I think in some cases the board vacates an earlier decision, but they did not do that here because basically their analysis reopened. I mean, I think the term was reopened, right? Yeah. And so it's still part of the prosecution history. I think it's still, the board can still rely on it, and like you said, Thermalife agrees that Barger itself has the correct chemical structure of creatine. And remember, that's creatine, that's the starting material. That's not creatine nitrate. So does Barger disclose the structure for creatine nitrate? Not the structure. It doesn't have a diagram. But it has the formula and it has the name, and that's the unique identifier. There's no other compound that has both the formula and the name. So I'm sorry, I'm over my time. Do you have further questions? Thank you. Your Honor, just to start with the last part, Barger does not unambiguously disclose the correct formula for creatine nitrate. That formula also matches creatine nitrate monohydrate, which if you look at the facts and the record and the evidence, that's more likely what DeSane produced. And the reason why he's more likely to produce that is because DeSane, the only one that this board relied on, the mixing method, used evaporation. And it's uncontested that evaporation dehydrates it and would create creatinine, not creatine. So that formula matches it. My friend from the PTO also said that Thermolife chose not to follow the mixing method in DeSane's. And that's wrong. Can I just ask, I don't know enough of the chemistry. If you take as a given, as I think you conceded below, that the page 69 Barger, actual structure for creatine is shown, would then using the language creatine nitrate, assuming that the creatine there was a reference to that structure, still allow you to say that creatinine nitrate would be covered? Or would that other piece of the formula have to change? Under Barger, Your Honor? Yes. So theoretically, you could do that. And below, what Thermolife pointed out was that that formula still used the dots. And it also has a parentheses, which is meaningless nowadays. But what's unequivocal here is that the board did not find that as a fact. They didn't incorporate the examiner's reference as they had to. And if they wanted to rely on the prior decision, they knew how to do it, and they did it here. They cited the prior decision. What do you make of the 2016 board decision, which expressly adopts the examiner's findings about the teaching of Barger on page 69 being creatine? It shows that they didn't do it now, in the opinion that matters. Because that opinion is essentially like a non-final office action. It doesn't mean that they expressly adopted it. They would have to expressly adopt it, just like they did in that opinion. But they didn't. And the evidence, it's not that Thermolife didn't choose to make the mixing method. Dr. Chamberlain said it was baffling and incomprehensible. But he also didn't stop there. He said the weights don't add up. That's irrefutable evidence. That's clear science that it doesn't work. It's irrefutable that the bubbling method doesn't work. And a posita would know all of this. And it's irrefutable that it says the same compound. And that if you, it's known to a posita, if you evaporate, if you dehydrate creatine, you're going to get creatinine nitrate, not creatine. So that, in context, Desain's probably produced creatinine nitrate monohydrate, which is a Desain formula in Barger. But it still doesn't change the fact that there's those four clear points, including the teaching away in Gemellan, which the board still has not, which the board now at least, or sorry, the PTO now at least acknowledges is a clear teaching away. So you have teaching away in Gemellan that is from LIBIG. Gemellan's at a compendium. That's from LIBIG, which came after Desain's. And it said, no matter what you mix creatine with, you're not going to get creatine nitrate. You're going to get either creatine or creatinine nitrate. So this is the weak, strong acid, weak acid point, which obviously there's a world between those two things. No, this is Gemellan, Your Honor. So Gemellan's teaching away at 4158. Gemellan's a compendium. So it recited Desain's, and then it looked to LIBIG to say that even LIBIG disclosed that even if you mix creatine with a strong acid, you're going to get creatinine. What about a weak acid? If you mix it with a weak acid, as they said in the next sentence, creatine's unaltered. You don't get a nitrate. You get nothing. That was a teaching that came after Desain's. That's what one of Oregonians here in the yard would know. In addition to that, you have the unequivocal facts that Dr. Chamberlain said about Desain's. The bubbling method doesn't work, and the mixing method doesn't work. And it's not conjecture. It's clear facts and clear science that the board has never addressed. Instead, what they said is this is substantially similar to Thermolife's method, but that's not true. Indeed, one of the most telling things is they say that it's simple high school chemistry, but nothing in the past 150 years was cited to support that. Thermolife instead overcame every single one of the modern references that the PTO put forward to show that a posita would simply mix the acid and base to create an amino acid salt. And that is very clear, and it's undisputed in the record. So it's undisputed facts and undisputed that there's nothing in 150 years that teaches otherwise, and the board's opinion is based simply on the say-so and its incorrect interpretation of Thermolife's method, which was different because of the water, different because of the crystallization. And indeed, in Desain's, the only element, the only element, the only mixing method, or sorry, the only method that supposedly caused crystallization without the evaporation was the gas bubbling method, which is another reason why Thermolife focused on it. But it doesn't work as a matter of irrefutable, unrebutted science. Thank you. We thank both sides and the cases.